THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v. CHARLES J. STREIFF, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v. JOHN L DAVIS, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v. RICHARD A. PAYNE, Appellant.

Fourth Department, April 13, 1973.

.260

*Rossi, Cohen & Durso* (*Vincent J. Rossi* of counsel), for Charles J. Streiff, appellant.

*Donald L. Austin* (*Louis Zywiak* of counsel for John L. Davis; *Donald L. Austin* of counsel for Richard A. Payne), for appellants.

*Richard D. Enders, District Attorney* (*Rocco Louis Versace* of counsel), for respondent.

DEL VECCHIO, J. P.    Defendants appeal from a judgment of conviction of murder committed during the course of their commission of the crime of attempted rape in the first degree.

On October 4, 1970 the nude body of Martha Kirk was found at the bottom of an embankment off the Penn Mountain Road in the Town of Steuben.    The thick shrubbery on the side of the embankment and around the body was not bent and had not been broken down, from which it might be inferred that the body had not been rolled down but had been thrown over the embankment.    Clothing and papers of the victim were found scattered on both sides of the road in an area which included Penn Mountain Road and Starr Hill.    An autopsy revealed that Martha Kirk died of asphyxia caused by strangulation in which the neck organs were compressed against the posterior aspect of the thorax closing the orifice of the thorax so that she could not breathe.    External examination of the body revealed a small laceration on the forehead and a compression just below the adam's apple which extended almost all around the neck at a width of one inch to a quarter of an inch and of varying depth.    Death had occurred at least four days prior to discovery of the body.

On September 30 the State Police had been notified by Walter Kirk that his sister was missing.    The same day they located her automobile in a parking lot at a restaurant (Merrill's) where the owner of the restaurant said it had been parked since he closed the restaurant early on the morning of September 27.    There was a drinking glass in the vehicle when it was found by the State Police.

After the discovery of the body the police interviewed a number of people concerning their actions and whereabouts on Sep-

tember 26 and 27, including the three defendants, each of whom said that he had not been at Merrill's on those dates.

According to the owner of Merrill's, the defendants had come to his place about 1:45 A.M. on September 27, stayed five to ten minutes, had two drinks, and left.

The defendants were questioned again at the State Police station on October 7 and 8 and confronted with the fact that the restaurant owner had placed them at Merrill's on September 27, contrary to their own previous statements. Defendant Payne was the first to give a written statement implicating himself in Martha Kirk's death. He was then brought into a room where he repeated to Streiff and Davis what he had told the police. Neither Streiff nor Davis claimed that Payne was lying or that what he had said was untrue, but thereafter each voluntarily made statements admitting his own participation in the criminal enterprise. With the consent of defendant Streiff the police examined his car and found in it a bracelet later identified as belonging to the victim.

Defendants were indicted in a three-count indictment. The first count charged that, while acting together and in concert and each being the accomplice of the other, the defendants attempted to commit the crime of rape in the first degree and in the course of and in furtherance of such crime, caused the death of Martha Kirk; the second count charged that, while acting together and in concert and each being the accomplice of the other, they recklessly caused the death of Martha Kirk; and the third count charged that, while acting together and in concert and each being the accomplice of the other, they with criminal negligence caused the death of Martha Kirk.

The defendants were tried together on the charges. At a *Huntley* hearing held prior to the trial the court found that each defendant had been duly and adequately advised of his rights under *Miranda* v. *Arizona* (384 U. S. 436) and that each signed statement had been freely and voluntarily given. Certain portions of each statement that implicated the other defendants were directed to be eliminated before the statement could be received in evidence on the trial, and this was done.

The trial itself consumed six weeks, during which the People offered circumstantial evidence together with the redacted statements by the defendants to establish guilt.

Before defendant Payne's statement was read to the jury, they were instructed that the statement was evidence only against Payne and that it was not received, and could not be considered, as evidence against the other two defendants. The statement

recited that Payne was then at the State Police station " to confess to the death of Martha Sue Kirk "; that Streiff, accompanied by Davis, picked him up about 8:30 P.M. on September 26, 1970 and they visited some taverns and drank beer; that about 12:30 A.M. they drove into the parking lot of Merrill's Restaurant and parked next to the car of Martha Kirk, whom he had known for about 9 to 11 years; that he went to her car, opened the door and tried to waken Martha, who was lying on the front seat; that at that time he left a drinking glass, which he had taken from a tavern visited earlier, in Martha's car; that, unsuccessful in waking her, they went into Merrill's and when they came out again tried to waken her; that she awoke and he told her that they were going to take her home; that they helped her into the back seat of Streiff's car where she passed out again; that he got in the back seat with her and got her awake partially; that he started kissing her, feeling her breast and got her pants down; that they stopped at a pull-off place on a road near Penn Mountain; that he still did not have his clothes off, got out of the car and pushed her legs to get her out of the car; that she started to struggle and tried to scream; that they got her out and on the ground; that they tore off her blouse or sweater and her bra; that she was on the ground or on a blanket from the car, naked; that the zipper of his pants was undone and he had an erection; that he lay down beside her on the ground; that soon he realized that she was not breathing anymore; that they then picked her up, put her in the back seat of the car and threw her clothes, which were on the ground, in the back of the car; that they drove further down the road, pulled into another drive-off area, pulled her out of the car, carried her to an embankment and tossed her into a ditch; that on the way he threw her clothing and other items out of both sides of the car; that he arrived at his home about 4 or 4:30 in the morning of September 27.

In his redacted statement, which was read to the jury after the court gave the same caution concerning its limited use as had preceded the reading of the Payne statement, defendant Davis said that he, Streiff and Payne were together about 8:30 P.M. on September 26; that they visited several taverns and drank beer; that at about 1:30 in the morning they pulled into the parking lot of Merrill's Restaurant and parked near Martha Kirk's car; that when they came out of Merrill's they walked over to Martha's car; that he helped Streiff and Payne put her in the back seat of Streiff's car; that he told Streiff to drive to Starr Hill, which he did; that when they arrived they pulled

off the road into a grassy place and he grabbed the girl and had her by the shoulders, lifting and pushing her out of the car; that she was carried about 10 to 15 feet from the car and laid on the ground; that someone removed her clothes and he saw her lying naked on the ground; that he heard she was dead and they decided to leave her there and they left for home; that on the way home they discussed what they would tell the police if they were asked about it.

After the jury was again admonished not to consider the statement as any evidence against the codefendants, the defendant Streiff's redacted statement was read. In it he had said that on the evening of September 26, 1970 he left home in his automobile with Davis and picked up Payne; that they stopped at several taverns and drank beer; that at Merrill's parking lot he saw Martha at about 1:30 a.m. slumped over on the front seat looking drunk and passed out; that they put her in the back seat of his car; that they went up in the hills where they all took Martha out of the car while she was still drunk and passed out, took her over a little bit from the car and put her down; that they left her there with Payne for about a half hour; that Payne came back to the car and said he thought she was not breathing and said, "Let's get out of here"; that on the way home he talked about it and he said, "What if we get caught? What will we do?"

The medical witness who performed the autopsy on the victim testified that strangulation was the cause of death, which would take less than two or three minutes, and that the victim's bra did not cause the marks around her neck. He said that there was no evidence of sperm, but that sperm would have disappeared after four days.

Each defendant took the stand at the trial and admitted that he, with the codefendants, had been at Merrill's at about 1:30 on the morning of September 27. Although Streiff denied having seen either Martha Kirk or her car at that time and place, Davis and Payne admitted that they had seen her car but denied having seen her. Streiff admitted that he had not told the police of his presence at Merrill's when he had first been interviewed by them. Each defendant repudiated his written statement, contending that it had been coerced. On cross-examination, however, Davis admitted that at a preliminary examination he had testified to a conversation with defendant Streiff in which he told Streiff that he (Davis) had signed a statement and said, "They got us". Although Payne thought that he had told the police in their earlier interview that he had been at Merrill's

on the night in question, he conceded that he had not told them that he had seen Martha's car there.

A medical expert called by defendants testified that Martha Kirk died of asphyxia; that it takes about four minutes to cause death by strangulation; that the victim's blouse or sweater could not have been a competent producing cause of death; and that although the bra might have been, it would not have caused the marks which were around the victim's neck.

On rebuttal, a State policeman present at the station when defendant Payne gave his statement testified that Payne said, "I'm glad it's all over, over. I haven't slept for a week."

The Trial Judge gave an extensive charge which stated the essential elements of the three degrees of homicide set forth in the indictment and included instructions that it was the task of the jury to determine what conduct it was that caused the death of Martha Kirk and whether that conduct satisfied the essential elements of a particular degree of homicide, whether murder, manslaughter, or negligent homicide; that intent was an essential element of the various crimes; that each defendant was entitled to a separate and distinct determination of culpability based upon the extent of his involvement and his mental culpability in connection with that involvement; that in order to establish felony murder the prosecution must prove beyond a reasonable doubt that there was an intent on the part of one or more of the defendants to commit, or at least attempt to commit, the crime of rape in the first degree; that to hold a person liable for the homicidal act of another in a felony murder requires a finding, first, that the person intentionally aided the killer, and, second, that he aided the killer with the specific intent to commit the underlying felony — in this case, a rape on the victim while she was physically helpless or by overcoming her resistance; that in considering the felony murder count if they found all the elements of a felony murder to exist beyond a reasonable doubt they should then proceed to determine the criminal culpability of each of the defendants; that in considering each count submitted they could find one or more guilty and others not guilty, as they should find the facts to exist from the evidence; that no defendant might be found guilty of a different degree of the homicide from another defendant since it was the character of the homicide which would bear on the determination of the degree of guilt; and that in the event the evidence was such that they had a reasonable doubt as to whether a felony murder was in fact committed, they should then consider the other two counts, which were in no sense lesser counts

to felony murder but were separate and distinct offenses. No exception was taken to these portions of the charge.

The jury returned a verdict of guilty of the first count of the indictment against each defendant.

Defendants now argue that the court committed reversible error when, in response to an inquiry by the foreman in the course of the jury's deliberations, it instructed the jury that they could not find one defendant guilty of one count and another defendant guilty of a different count of the indictment.

This instruction was consistent with the main charge and, again, as in the case of the main charge, no exception was taken. In the absence of an exception or objection, this court has "no power (even assuming the charge was erroneous) to reverse on the law because of defects now said to be found in the charge" (*People* v. *Cohen,* 5 N Y 2d 282, 290; *People* v. *Rossi,* 11 N Y 2d 379, 383). Nor would we exercise our discretionary power to reverse the convictions, in the interest of justice, absent an exception or request. Alerted by the foreman's inquiry that the jury had a question about the propriety of verdicts of guilt on different charges against the various defendants, defense counsel nonetheless acquiesced in the court's instruction that such a disposition was not permissible. At oral argument of the present appeals counsel conceded that the issue was not raised and gave as reasons for this acquiescence that in their opinion the jury would not convict all three defendants of felony murder, but would acquit one or two of them under that count; and that if they requested a charge which would have permitted a conviction of a lesser degree, the jury would then find one guilty of the felony count and one or both of the others guilty of manslaughter or criminally negligent homicide, as indicated by the foreman's question. Defendants had the advantage of the strategic move which they employed. Because the outcome was not as they had anticipated, we should not now put them in the position in which they would have been had they chosen to take an exception. If an attorney chooses not to raise a point of law by excepting to the charge or making a request to charge "because he believes it better for his client not to raise it, we would work fundamental changes in the adversary system if we determine he should have done that which he had decided advisedly not to do" (*People* v. *De Renzzio,* 19 N Y 2d 45, 51).

Furthermore, this new contention along with others raised for the first time on this appeal could have been obviated or cured at the end of a six weeks' trial (*Telaro* v. *Telaro,* 25 N Y 2d 433, 439) and failure to take an exception or make a request with

regard to the charge precludes review of the question (*People* v. *Reynolds,* 25 N Y 2d 489, 495). " Points raised by briefs, not properly presented by the record, are ordinarily not considered by the court " (*People* v. *Hicks,* 287 N. Y. 165, 174).

The position now advanced would have permitted a finding of guilt of felony murder with respect to one defendant and guilt of a lesser degree of homicide with respect to another. On the proof offered at the trial, however, the jury was justified in finding only complicity in felony murder, if one were found to have been committed, or innocence of any degree of homicide on the part of any defendant who did not commit the killing. As the court instructed, if the jury found that one or more of the defendants caused Martha Kirk's death and that the death occurred during an attempt to commit the crime of rape in the first degree, then it was required to determine the criminal culpability of each defendant, depending upon its finding of his criminal involvement. Criminal involvement was defined as requiring two elements: first, intentionally aiding the killer and, second, a specific intent to commit the underlying felony, here, rape. If the jury concluded that these elements were established with respect to each non-killing defendant under consideration, he was criminally liable and equally guilty with the killer of felony murder (Penal Law, § 20.00; *People* v. *Lieberman,* 3 N Y 2d 649, 652; *People* v. *Udwin,* 254 N. Y. 255, 262). If, however, these elements were not established, then the defendants who did not effect the killing were guilty of no degree of homicide and would have to be acquitted. Once a felony murder was found and the jury identified the killer, the other defendants were related to the homicide by virtue of being accomplices to the attempted rape or not at all. In this circumstance it would have been error to authorize the jury to return verdicts of the lesser degrees of homicide set forth in the indictment for some of the defendants along with a verdict of felony murder — in effect charging the lesser degrees of the crime as to those who the jury found did not actually commit the killing. " Ordinarily where the evidence shows that the accused has actually killed another in the commission of a felony, or otherwise, the trial judge must charge the degrees of homicide, *but the trial judge may not do so where the accused is an accomplice in the felony and is not otherwise a party to the homicide. (People* v. *Seiler,* 246 N. Y. 262.) " (*People* v. *Hicks, supra,* p. 171; *People* v. *Martone,* 256 N. Y. 395.) (Emphasis supplied.)

Finally, if death occurred while Martha Kirk was being removed from Streiff's automobile, then none of the defendants

could have been found guilty of felony murder, because the attempted rape had not yet gone beyond the preparation stage (*People* v. *Ditchik,* 288 N. Y. 95; *People* v. *Spruill,* 20 A D 2d 901), which the court had charged was not sufficient to constitute an attempt. Giving heed to the court's instruction, as we must assume the jury did (*People* v. *Lobel,* 298 N. Y. 243, 254), the jury would then have passed to a consideration of the lower degrees of homicide charged in the other counts of the indictment. Since it did not do so, we need not consider the application of the challenged instruction to verdicts of manslaughter and criminally negligent homicide.

By its approval of Payne's felony murder conviction, the dissent concedes that Martha Kirk's death was caused during the commission of the crime of attempted rape as charged in the first count of the indictment. In this circumstance the jury could not — as the dissent suggests — have found the codefendants Streiff and Davis guilty of manslaughter second degree or criminally negligent homicide, because the jury had concluded that death did not occur prior to the commission of the felony and the only connection of these codefendants with the killing, if any, rested on their involvement in the felony. If they lacked the intent that the rape take place, they were not guilty of any of the other degrees of homicide charged in the indictment; therefore the verdict as to them, once the felony murder by Payne was determined, had to be either guilty of felony murder or not guilty, as charged by the court.

Defendants also challenge the sufficiency of the evidence supporting the jury's verdict, asserting that there was no direct evidence of intent with regard to commission of rape and that the evidence of the underlying felony was not sufficiently corroborated.

The difficulty inherent in proof of intent was confronted by the Court of Appeals long ago in *People* v. *Conroy* (97 N. Y. 62, 77–78), in which it was said: "Whenever intent is made an element in determining the character of an act, it is in accordance with our general observation and experience to infer its existence, by reference to the laws which have been usually and generally found to control human conduct. Indeed, this is the only method by which the intent can be made to appear. The intent formed, is the secret and silent operation of the mind, and its only visible physical manifestation is in the accomplishment of the thing determined upon. The individual whose intent is sought to be ascertained may remain silent, or if he speaks may, and probably will if he has a crime to conceal, speak

untruly, and thus the mind is compelled from necessity to revert to the actual physical manifestations of the intent, exhibited by the result produced, as the safest if not the only proof of the fact to be ascertained ''. It is well established that `` a person is presumed to intend the natural consequences of his act '' (*People* v. *Lieberman,* 3 N Y 2d 649, 652).

Here, the jury had before it statements by each defendant placing himself in the company of the codefendants with the victim in the early morning of September 27 and admitting that after leaving Merrill's Restaurant he helped put the drunken, passed out girl in a car in which they drove her to a mountain road, pulled off the highway, and removed her from the car, depositing her on the ground. Payne said after Martha was removed from the car he tore off her blouse and bra, unzipped his pants, exposed himself and lay down next to her until she stopped breathing. Streiff said that after Martha was out of the car she still had clothes on; he helped carry her away from the car and left her with Payne for a half hour before Payne said that she had stopped breathing; on the way home he was scared and said, `` What if we get caught? What will we do? '' Davis said he helped get her out of the car, saw Payne and Streiff carry her 15 feet from the car and lay her on the ground. Subsequently he heard a conversation indicating that the girl might be dead. He too said that on the way home they discussed what they would tell the police if they were asked.

The jury also had proof that, when questioned initially about their activities on September 26 and 27 each defendant denied even that he had been at Merrill's — denials which were shown to be untrue by their testimony at the trial. This makes relevant the statement in *People* v. *Willett* (213 N. Y. 368, 386): `` A guilty consciousness may always be inferred from falsehood, misrepresentation, evasion, equivocation or by suppression of the facts ''.

To summarize:

The existence of a common purpose and design may be proved by circumstantial evidence and may be inferred from the conduct and admissions of the individual defendants (*People* v. *Van Tassel,* 156 N. Y. 561, 564–565).

The jury could fairly infer, from a well-connected chain of circumstantial and independent proof together with the admissions made by each defendant, that while they were in Merrill's Restaurant each agreed on a common purpose and design that one or all would have sexual intercourse with the girl, and that while acting together and in concert each being the accomplice

of the other jointly transferred her to Streiff's car and transported her to a secluded area to implement that purpose and design and in furtherance thereof caused her death. The jury could also conclude from the photographs and the description of the area in which the body was found that each helped in disposing of the body and in attempting to remove evidence of the crime (see *People* v. *La Belle*, 18 N Y 2d 405).

Implicit in the verdict is a finding, conceded by the dissent, that Payne, in an attempt to commit the crime of rape in the first degree and in the course of and in furtherance of such crime, caused her death. There was nothing in the statements of Streiff or Davis to indicate that each was not a willing and active participant from start to finish in the commission of the crime, nor that they wholly and effectively detached themselves from the criminal enterprise in advance of the fatality. The acts of each from the time he helped to put Martha Kirk in Streiff's car until her death were inconsistent with innocence and point to guilt.

Also implicit in the verdict is a finding that each intentionally aided Payne with the specific intent to commit rape, one of the necessary elements which the court charged must be established before the jury could find these defendants equally guilty of felony murder. In view of this finding, each was an accomplice in the purpose and design to commit the felony of rape, during the course of which murder was committed; thus, each is inculpated in that crime, and Streiff and Davis, the non-killers, were guilty of felony murder (*People* v. *Chapman*, 224 N. Y. 463).

There is no merit to the argument advanced by defendants that the attempted rape was not sufficiently corroborated. Corroboration of the kind that would be required if the convictions were for rape was not necessary. As stated in *People* v. *Harris* (282 App. Div. 156, 159, affd. 306 N. Y. 345): "Here the woman is dead and the conviction is not for rape but for murder." In that case, as in the instant case, the jury's verdict of felony murder was sufficiently supported by a well-connected chain of circumstantial and independent evidence in addition to the defendant's partial admission to the police.

Following a *Huntley* hearing and preliminary determinations that the *Miranda* warnings had been given and the defendants' statements voluntarily made without coercion, these questions were again submitted to the jury under proper instructions. The conflicting testimony given by the defendants and by the police officers concerning the circumstances of the taking of the statements presented clear questions of fact and credibility within the province of the jury.

Streiff alone moved for a severance. The motion was made after the *Huntley* hearing at which each defendant testified and was available for cross-examination and following which the court eliminated certain portions of each statement that referred to the codefendants. Insofar as each redacted statement implicates a codefendant, the admission of participation by each codefendant was substantially to the same effect as the statements of his codefendants. This distinguishes the present case from *Bruton* v. *United States* (391 U. S. 123). (See *People* v. *Stanbridge,* 26 N Y 2d 1; *People* v. *Baker,* 26 N Y 2d 169; *People* v. *McNeil,* 24 N Y 2d 550; *People* v. *Anthony,* 24 N Y 2d 696, 702.) We believe that the trial court did not abuse its discretion in denying the motion for a separate trial of Streiff (CPL 200.40). Apparently no order was submitted, signed or entered.

Each defendant also testified at the trial and was again available for cross-examination. Streiff was not required to sacrifice any of his *Miranda* rights for implementation of his *Bruton* rights. Once Payne had taken the stand, both at the *Huntley* hearing and at the trial, Streiff was entirely free to pursue extensive cross-examination of Payne, irrespective of the decision he made to testify or not in his own behalf.

The court, in eliminating certain portions of Payne's statement neglected to redact the words, " Chuck and John said they wanted to try for awhile " from a long paragraph which contained the sentence, "I still did not have my clothes off and Chuck and John said they wanted to try for awhile and they said lets get her out of the car." This was a harmless error since it did not contribute to the conviction. Furthermore, Streiff did not object to reading Payne's entire statement to the jury. Following the limiting instruction given at the request of Streiff's attorney, before the reading of the Payne statement, counsel then said: " Thank you, Your Honor, I'll allow it to be read."

Other errors committed during the trial are alleged by defendants to warrant a reversal of the judgment of conviction. We find no such error (CPL 470.05, subd. 1). To the contrary, some errors which were committed in the admission of evidence worked to the advantage of the defendants, as when relatives testified to defendants' self-serving declarations of innocence. As has been observed, " errors are almost inevitable in any trial, improprieties almost unavoidable, but the presence of one or the other furnishes no automatic signal for reversal and retrial " (*People* v. *Kingston,* 8 N Y 2d 384, 387). " A defend-

ant is entitled to a fair trial but not a perfect one '' (*Bruton* v. *United States*, 391 U. S. 123, 135, *supra*).

We note with disapproval the conduct of defendants' counsel in obtaining an affidavit from the jury foreman concerning the deliberations of the jury in the jury room used for the purpose of impeaching the verdict (Civil Rights Law, § 14). While it has been recognized that, in some circumstances, constitutional considerations compel the acceptance of statements concerning outside influences on a jury, nevertheless '' in the case of statements regarding juryroom deliberations '' where '' every verdict might be rendered suspect, and jurors might become subjected to continuous posttrial harassment, the public policy reasons for holding such statements inadmissible must ordinarily override possible injustice to a defendant, for here our jury system iself is at stake '' (*People* v. *De Lucia*, 20 N Y 2d 275, 279; see, also, *McDonald* v. *Pless*, 238 U. S. 264).

The judgment of conviction should be affirmed.

CARDAMONE, J. (dissenting). I concur in the affirmance of the judgment of conviction with respect to defendant Payne. I part from my brothers with respect to defendants Streiff and Davis and vote to reverse their convictions and order a new trial in each case. In my view the trial court's charge improperly limited the jury and such mandates a reversal in the interest of justice regardless of counsels' failure to take an appropriate exception (CPL 470.15, subd. 3, par. [c] and subd. 6, par. [a]; *Buel* v. *People*, 78 N. Y. 492; *People* v. *Jones*, 32 A D 2d 1069).

By its charge the court precluded the jury from finding Payne guilty of felony murder and the other two defendants guilty of a lesser degree of homicide. Upon a reasonable and permissible view of the facts, however, such a finding would have been possible and the jury expressed, through its request for instructions, a very apparent desire to so find.

It is fundamental law that '' if, upon any view of the facts, a defendant could properly be found guilty of a lesser degree or an included crime '' such alternative must be given to the jury as a benefit to which the defendant is entitled (*People* v. *Mussenden*, 308 N. Y. 558). Charging-down arose historically as a response to the often harsh application of the felony-murder doctrine. It has become a fundamental right to which a defendant is entitled in order for a defendant to have a fair trial. The failure of the trial court to charge-down deprives the defendant of his right to a fair trial because such a failure presents the jury solely with the Trial Judge's view of the evidence and thus

constitutes an undue invasion by the court of the exclusive province of the jury (*People* v. *Oddy,* 16 A D 2d 585). The facts in this case plainly are susceptible to varying interpretations. A permissible view of the evidence with each defendant as a principal actor in causing the death would have entitled each individual defendant to a charge-down independent of the other defendants solely upon their respective culpability (cf. *People* v. *Martone,* 256 N. Y. 395). Even assuming that the jury concluded, on another permissible view of the proof, that the death occurred outside the car while Payne was committing the felony of attempted rape, the jury still could have concluded that either or both of the other defendants lacked the specific intent that the rape take place. Under such circumstances Davis and Streiff might have been found to be reckless (guilty of manslaughter second) or negligent (guilty of criminally negligent homicide) with respect to the victim's death. The court's charge that each defendant must be found guilty of the same degree of homicide or not guilty of any homicide at all precluded the jury from finding different degrees of homicide for the respective defendants and put the jury in the position of having either to acquit Streiff and Davis, who they may well have thought were in part responsible, or convict them of felony murder.

This is not a case where only one defendant acted with respect to this victim and the other defendants' liability was dependent upon their involvement with the perpetrator as the trial court charged. Rather this case involved three defendants each of whom acted with respect to the victim. While they might each have been guilty of felony murder, the fact that one was guilty of felony murder did not preclude a jury finding that the others were guilty of some lesser homicide. The court's charge to the contrary was not warranted under the circumstances.

The defendant Streiff's motion for a severance and separate trial was denied by the trial court and, in my view, is further reason to reverse Streiff's conviction and grant him a new trial. The majority has refused to invoke the *Bruton* rationale (*Bruton* v. *United States,* 391 U. S. 123) on the theory that since all the defendants were available for cross-examination the confrontation problem present in *Bruton* was lacking here. While the availability of the witnesses for cross-examination ostensibly alleviates the problem of lack of confrontation, a distinction must be drawn between merely having the witness on the stand and having the witnesses available for "effective" cross-examination. In *Douglas* v. *Alabama* (380 U. S. 415), cited and discussed with approval in *Bruton,* the court expressly directed

its attention to the notion of *effective* confrontation and cross-examination. In that case, two individuals Loyd and Douglas, charged with assault with intent to murder were tried separately. Loyd was tried first and found guilty and then called to testify against Douglas at his trial. Loyd, invoking his privilege against self incrimination, refused to answer any questions. The prosecution was permitted to examine Loyd as a hostile witness and asked him to confirm or deny statements read from a writing purported to be his confession. These statements inculpated Douglas. The Supreme Court held that Douglas' inability to cross-examine Loyd denied Douglas the right of cross-examination secured by the Confrontation Clause of the Sixth Amendment. The court noted (p. 420) that " effective confrontation * * * was possible only if [the witness] affirmed the statement as his."

It is plain from a reading of *Bruton* and *Douglas* that the confrontation guaranteed by the Sixth Amendment requires more than the mere presence of the codefendant on the witness stand. The rule derived from these cases is that if the party whose statement inculpates his codefendant asserts a constitutional privilege or adopts a position which prevents *effective* cross-examination, then, the court must act so as to safeguard to the inculpated codefendant his right of confrontation. In the present case, we are presented with this precise problem. Defendant Payne's statement supplied the culpable mental state lacking in defendant Streiff's confession. When called as a witness, however, Payne claimed that his *Miranda* rights had been violated and that his confession was coerced and was untrue. Since Payne refused to affirm his statement, there could be no effective cross-examination or confrontation of him by defendant Streiff's attorney on the substance of Payne's statement.

The majority position assures to codefendant Payne the right to assert his constitutional privilege against self incrimination at the expense of his codefendant, Streiff's, constitutional right of confrontation. Thus the majority view " picks and chooses " with respect to the constitutional rights of codefendants, preserving one but not the other, and illustrates the heavy prejudice which results to a codefendant in the position that defendant Streiff is in when the trial court fails to delete the inculpating material. Thus, a redaction at least (if not a severance) was mandated with respect to the damaging portion of Payne's confession in the case against defendant Streiff (*People* v. *La Belle*, 18 N Y 2d 405). The failure to delete this material was clearly prejudicial to defendant Streiff.

Accordingly, I conclude that the convictions of defendant Streiff and defendant Davis should be reversed and a new trial ordered in each case.

WITMER and MOULE, JJ., concur with DEL VECCHIO, J. P.; CARDAMONE, J., dissents in part and votes to affirm as to Payne and to reverse on the law and grant a new trial as to Streiff and Davis, in an opinion.

Judgments affirmed.